**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

BERNITA GREEN, individually          )
and on behalf of others similarly    )
situated,                            )
                                     )
       Plaintiff,            )
                                     )
v.                                   )    Civil Action No.
                                     )    4:21-cv-00237-WTM-CLR
                                     )
ATLAS SENIOR LIVING, LLC             )
f/k/a SHEPHERD SENIOR LIVING,        )
LLC,                                 )
                                     )
       Defendant.            )

## DEFENDANT'S RESPONSE IN OPPOSITION TO PLAINTIFF'S MOTION FOR CONDITIONAL CERTIFICATION OF A COLLECTIVE ACTION AND ISSUANCE OF COURT-APPROVED NOTICE

Bernita Green quit her job as a Medical Technician ("Med Tech") with Legacy at Savannah Quarters, an assisted living facility operated by Atlas Senior Living ("Atlas"), after being accused of abusing a resident. The company's investigation ultimately cleared her of any wrongdoing, but she was so upset over the accusation and her perception that the investigation was mishandled, she resigned before the process was completed. Green went to see a lawyer and began recruiting other employees to join her in a lawsuit against Atlas. She filed this lawsuit claiming that she and other "similarly situated" employees were not paid for missed meal breaks. She convinced six other former employees, including her sister, to join the case. Although she says there are others who want to join, none have done so since the case was filed, despite recruitment by her and her sister.

Green now asks this Court to certify the case as a collective action and invite all hourly employees, regardless of position, shift, or department over a three-year period to join in the case. Remarkably, this three-year period includes a year during which Green worked for a different company (that she has not sued) and was not under the automatic deductions policy at issue in this case. She filed her motion on November 5, 2021, before any discovery was conducted. Her motion is supported by three declarations, one from herself (which she did not read), one from her sister, and one from a third employee who has disavowed material parts of her sworn statement. Atlas opposes the motion because Green has not met her burden of showing there are other similarly situated employees who desire to join in the case. Moreover, testimony from Green, and those she asks the Court to include in the "collective," demonstrates that this case should not proceed as a collective action.

In this Response, we first explain how Legacy at Savannah Quarters operates, including its policies regarding meal breaks for employees. Then, since Green is the Named Plaintiff, we go into some detail about what she has said under oath about missing meal breaks, including the extent to which she disclosed any missed breaks to Atlas through any of the several options she had under company policy, and her basis for saying others want to join this case. Next, and most important for the motion at hand, we show how varied the testimony is – **<u>on facts that are critical to determining liability</u>** – among the Named Plaintiff Green, the six former employees who have consented to join the case, and some who have not joined but whom Green asks the Court to extend an invitation. Finally, we lay out the applicable law and apply it to the factual record before the Court. This analysis

leads to the inescapable conclusion, reached by other courts in similar cases, that since it would be impossible to determine liability on a class-wide basis (and there is insufficient evidence of others wanting to join), Green's motion should be denied.

## I.   FACTS

On August 30, 2019, Atlas purchased an assisted living facility in Pooler, Georgia from Shepherd Senior Living. (Todd Decl. ¶2) (Doc. 42-16).[1] Atlas has operated the facility under the name Legacy at Savannah Quarters since it took over. *Id.* The community has two buildings, one for assisted living residents and one for residents who need memory care. *Id.* at ¶3. It is licensed for 124 beds and operates with 50-60 employees. *Id.* There are five departments: Health & Wellness or Nursing, Housekeeping, Kitchen, Concierge, and Maintenance. *Id.* The head of each department reports to the Executive Director.  (*Id.* at ¶3; Green Dep. 55) (Doc. 42-2).

The Nursing Department has two units: Assisted Living and Memory Care. (Todd Decl. ¶4) (Doc. 42-16). The Assisted Living Coordinator and the Memory Care Coordinator report to the Director of Health & Wellness who reports to the Executive Director. *Id.* The Nursing Department operates around the clock using three shifts: 7:00 am – 3:00 pm, 3:00 pm – 11:00 pm, 11:00 pm – 7:00 am.[2] *Id.* The Care Staff, which is made up of Caregivers and Med Techs, work one of the three shifts. (*Id.* at ¶5; Morgan Decl. ¶¶3-4) (Doc. 42-15). Some of the Care Staff volunteer to work double or back-to-back 8-

---

[1] Atlas filed an Evidentiary Submission, which catalogs and attaches the relevant transcripts, declarations, and exhibits that support this Response. The Evidentiary Submission is filed as Doc. No. 42.

[2] Legacy at Savannah Quarters recently went from three 8-hour shifts to two 12-hour shifts.

hour shifts. (Green Dep. 43; Sibert Dep. 18-19) (Docs. 42-2, 42-7). The supervisory employees in the Nursing Department, which consist of the Director and two Coordinators, generally work 8:00 am to 5:00 pm. (Green Dep. 71; Todd Decl. ¶6) (Docs. 42-2, 42-16). A supervisor is on call during the evening and night hours of the second and third shifts when there is not a supervisor present at the facility. (Todd Decl. ¶6) (Doc. 42-16).

The Caregivers are responsible for assisting residents with activities of daily living. *Id.* at ¶7. The Med Techs' primary responsibility is dispensing medicine to residents, and they also assist residents with activities of daily living. (Green Dep. 14) (Doc. 42-2). They operate a locked "med cart" where medicines are stored. (Todd Decl. ¶7) (Doc. 42-16). The med cart is a secure, portable pharmacy that a Med Tech is assigned to take medicine to residents wherever they are located within the community. *Id*.

The other departments, which do not provide direct care to the residents, run on different schedules and shifts as compared to the Nursing Department. *Id.* at ¶8. The other departments, unlike Nursing, are not 24-hour operations. (*Id.*; Green Dep. 99) (Doc. 42-2). For example, the Kitchen is only open 13 hours a day, with two overlapping 8-hour shifts: 6:00 am to 2:30 pm and 10:30 am to 7:00 pm. (Johnson Decl. ¶2) (Doc. 42-12). The schedules for the housekeeping staff vary by employee.  One works 8:00 am to 4:30 pm four days a week. The other works 6:00 am to 2:00 pm. (Clark Decl. ¶2) (Doc. 42-18). The Concierges only work during the day, 8:00 am to 6:00 pm. (Dampier Decl. ¶3) (Doc. 42-19).

Shortly after Atlas took over the operation of Legacy at Savannah Quarters, it contracted with Paycor to be its timekeeping and payroll provider. (Todd Decl. ¶9) (Doc.

42-16). The Paycor system offered the option of automatic deduction for meal breaks instead of having employees clock in and out for their 30-minute break each shift. *Id.* Clocking in and out for meal breaks meant employees were required to clock in or out four times a shift, which increased the chances of missed punches and the need for manual corrections. *Id.*   Indeed, dealing with missed punches had been a problem for the facility. *Id*. Therefore, Atlas opted for a system of automatically deducting 30 minutes each 8-hour shift for meal breaks.  (*Id.*; Green Dep. 22) (Doc. 42-2).

Atlas informed employees of the new system for meal breaks in a variety of ways. (Todd Decl. ¶10) (Doc. 42-16). When Atlas first went to an automatic deduction system, it had current employees sign an "Associate Acknowledgment of Break Auto Deduction" that says:

> By signing below, I _____ acknowledged that I have been informed that 30 minutes will be deducted for break time for every 7 hours I work.  <u>I understand it is my responsibility to document on the time exception form and notify my supervisor, prior to payroll processing, if I am unable to take the allotted break time so that my work time will be appropriately recorded and compensated</u>.

(Ex. 16, 18, 24, 27, 37 to Pl. Dep.) (Docs. 42-9, 42-10) (emphasis added).[3] Atlas went over the auto deduct policy with new hires in orientation and had them sign the same acknowledgment form. (Richards Dep. 20) (Doc. 42-6). Atlas covers the policy in more detail in its employee handbook:

**Recording Work Hours**

---

[3] Named Plaintiff Green never signed this form. Of the six Opt-in Plaintiffs, five (Chiquita Brown, Tameka Sibert, Brittney Michell, Marsha Grant, and Tawanya Richards) signed this acknowledgment form and one (Kiara Hartwell) did not.

. . . Associates must notify their supervisor in writing through a time exception form if they were unable to take a break so that work hours can be adjusted to reflect hours worked. . . .

### To Report Concerns or Obtain More Information

. . . If you believe you have been subject to any improper deductions or your pay does not accurately reflect your hours worked, you should immediately report the matter to your supervisor. If your supervisor is unavailable or if you believe it would be inappropriate to contact that person (or if you have not received a prompt and fully acceptable reply), you should immediately contact the Executive Vice President at (877) 402-8527, or any other supervisor in Atlas Senior Living with whom you feel comfortable.

(Ex. 3 to Pl. Dep.; Todd Decl. ¶10) (Docs. 42-8, 42-16) (emphasis added).

Atlas also conducted in-service meetings for employees in the Nursing Department. (Todd Decl. ¶10; Joyner Decl. ¶6) (Docs. 42-16, 42-17). On September 30, 2020, Cathy Taylor, Director of Health and Wellness at the time, conducted a one-hour meeting on the topic of Breaks. (Sibert Dep. 49-50) (Doc. 42-7). Taylor told the employees in attendance to take their breaks.  She told them 30 minutes would be automatically deducted. She explained what to do if they were not able to take a meal break: fill out a form so they could get paid for the time. *Id*. The attendees signed an attendance roster. (Ex. 20 to Pl. Dep.) (Doc. 42-9). Bernita Green attended this meeting.[4] (Green Dep. 71-72) (Doc. 42-2).

Employees can review their time before it is submitted to payroll. *Id*. at 36. They may do so on their cell phones through an app provided by Paycor called Time on Demand. (Goodwin Decl. ¶5) (Doc. 42-13). They also have the option of logging into their account

---

[4] As to the six Opt-In Plaintiffs, one (Tameka Sibert) admits attending the meeting. (Sibert 49-50). Another (Chiquita Brown) signed the attendance roster but denies attending.  (Brown Dep. 18-19). Four (Brittany Mitchell, Marsha Grant, Kiara Hartwell, and Tawanya Richards) did not attend. (Ex. 20 to Pl. Dep.).

on a computer. (Green Dep. 37-38) (Doc. 42-2). Employees' Paycor accounts are password protected.  An employee uses her unique username and password to login. *Id*. at 51-52. After reviewing their time, they click on the "Approve Time Card" button to indicate they have reviewed and approved their time before it is submitted to payroll. (Goodwin Decl. ¶¶8-12) (Doc. 42-13). One supervisor in the Nursing Department regularly followed up with employees to ask them to review their time before the supervisor submitted it to payroll. (Green Dep. 69; Sibert Dep. 66-67; Grant Dep. 24) (Docs. 42-2, 42-7, 42-3). Paycor is able to provide a report showing for which pay periods an employee approved her time. (Goodwin Decl. ¶¶13-18, Ex. A) (Doc. 42-13). Green approved her time every pay period. (Goodwin Decl., Ex. A). She checked her time records more often than every pay period. (Green Dep. 47) (Doc. 42-2). She also showed other employees how to check their time on the computer. *Id*. at 42.

How employees take meal breaks varies from department to department. In the Nursing Department, there was a brief period of time when break times were assigned. That system did not last long. (Hartwell Dep. 30-31) (Doc. 42-4). Other than during that brief period of time, it has been up to an employee when to take her meal break. They are not allowed to take their meal breaks at the same time, because there has to be adequate staff available to care for the residents. (Morgan Decl. ¶5) (Doc. 42-15). Care Staff do not need supervisor approval to go on break. (Sibert Dep. 96) (Doc. 42-7). They only need supervisor approval to leave the building. When a Med Tech goes on break, she must lock her med cart or have another Med Tech relieve her on the cart. (Green Dep. 63-64) (Doc. 42-2). Caregivers do not have to be relieved. Given the nature of the Care Staff's duties,

there are instances where the Care Staff could be subject to being pulled away from a meal break to care for residents' immediate needs. This is not the case for other departments. The kitchen and housekeeping employees, in contrast to the Nursing Department, are allowed to take meal breaks together. (Johnson Decl. ¶3; Clark Decl. ¶3) (Docs. 42-12, 42-18). Concierges have to cover for each other while they separately take their meal breaks. (Dampier Decl. ¶5) (Doc. 42-19).

A.    **Bernita Green's Testimony.**

Green was a Med Tech who worked for Atlas until she voluntarily resigned following an allegation of resident abuse. (Green Dep. 101-11) (Doc. 42-2). Atlas's investigation of the abuse allegation ultimately cleared her of any wrongdoing, but she was so upset over the accusation and her perception that the investigation was mishandled, she resigned before the process was completed. *Id.*

During her employment with Atlas, Green worked the 3-11 and 11-7 shifts. She worked double shifts 99% of the time. *Id.* at 43. Except for a couple of hours at the beginning of the 3-11 shift, there was not a supervisor in the Nursing Department while Green worked. *Id.* at 71. As a Med Tech, she was effectively in charge. *Id.* at 63. Green testified she was usually only able to take one or two lunch breaks a week, and during some weeks, she was not able to take any meal breaks. (Green Decl. ¶4) (Doc. 42-9). It was hardest for her to take a break during the Pandemic. (Green Dep. 57-58) (Doc. 42-2). When there was a Covid outbreak at Legacy of Savannah Quarters, the facility was at times short staffed. Sometimes, Green was the only Med Tech working. In that case, there was no one to relieve her on the med cart, making it almost impossible for her to take a meal break.

*Id*. at 61-64. According to Green, it was harder to take meal breaks on the evening and night shifts than on the day shift. *Id*. at 61. On occasion, when she worked a double shift, a supervisor approved her to take her breaks back-to-back and leave the building. This accommodation gave her a full hour to pick up her son. *Id*. at 65-66. Green was in nursing school during her employment at Atlas. Once or twice a week, Green did her schoolwork during her shift and while on the clock. *Id*. at 67.

Green never filled out a missed punch or exception form to have her time adjusted to account for a missed meal break. In her view, the form was not for that purpose.[5] It was only for use when she either forgot or was unable to clock in or out. *Id*. at 31-34. Of all the times she was unable to take a meal break, she only told a supervisor "once or twice." *Id*. at 78-79. She told Michelle Morgan after checking her time in the Time on Demand system. One time, Morgan corrected her time so that Green was paid for the missed meal break. *Id*. at 84-85. On the other occasion when she told Morgan and her time did not get corrected, Green noticed in Time on Demand that her time had not been adjusted. However, she did not take any further action to report the inaccuracy or to have it fixed. *Id*. at 88. She did not follow back up with Morgan. She did not go to the Human Resources Manager, the Executive Director, or any other member of management. *Id.* at 87-88. On one occasion, Green noticed a discrepancy when she reviewed her paystub in Paycor. She notified Mary Dampier in Human Resources, and Dampier corrected the problem. *Id*. at 83.

---

[5] For purposes of this opposition only, Atlas will accept Green's testimony on this issue as true, despite its incredible nature and overwhelming inconsistencies.

Every Opt-in Plaintiff first heard about this case from Green or her sister Tameka Seibert. (Brown Dep. 9-10; Sibert Dep. 12; Grant Dep. 7-8; Hartwell Dep. 7; Richards Dep. 14) (Docs. 42-1, 42-7, 42-3, 42-4, 42-6). Green made a list of employees she thinks would be interested in joining the case. (Ex. 12 to Pl. Dep.) (Doc. 42-9). It includes the ones who have already opted in. These are employees she has heard complain about being unable to take meal breaks. (Green Dep. 98-99) (Doc. 42-2). All of them worked in the Nursing Department. There are not any employees on the list who worked in departments other than Nursing. *Id*. at 120-21. There are 11 names on the list besides those who have already opted in.  (Ex. 12 to Pl. Dep.) (Doc. 42-9).

Green signed a declaration that was submitted to the Court in support of her motion for certification. (Ex. 9 to Pl. Dep.) (Doc. 42-9). She did not prepare it. She does not know who did. She "probably" did not read it before she signed it. (Green Dep. 75-76) (Doc. 42-2). The hourly rate referenced in the declaration is wrong. *Id*. at 76. Opt-in Plaintiffs Sibert and Hartwell also signed declarations. (Ex. 21, 34 to Pl. Dep.) (Doc. 42-10). Hartwell's declaration says she notified her supervisors two times in writing that she could not take meal breaks. However, Hartwell admitted this "fact" is not true.  She only told one supervisor, verbally, that she missed meal breaks. (Hartwell Dep. 38-43) (Doc. 42-4).  She never reported or complained about a missed meal break in writing. *Id*.

**B.**      **The named Plaintiff, Opt-in Plaintiffs, and Putative Plaintiffs differ on:**

1.      Whether they missed meal breaks at all.

Named Plaintiff Green and the six Opt-in Plaintiffs[6] all say they missed meal breaks at one time or another during their employment with Atlas.

Two Putative Plaintiffs in the Nursing Department, Brittni Barrett and RaShada Taylor, have never missed a meal break. (Barrett Decl. ¶7; Taylor Decl. ¶6) (Docs. 42-11, 42-14). Tamme Clark, a Putative Plaintiff in Housekeeping, has also never missed a meal break. (Clark Decl. ¶5) (Doc. 42-18).

2.      The frequency and time period of missed meal breaks.

Green testified in her declaration that she was usually only able to take one or two lunch breaks a week and sometimes was not able to take a lunch break at all during the week.  (Ex. 9 to Pl. Dep.) (Doc. 42-9). That is over 200 missed meal breaks in a year and a half.

Opt-in Plaintiff Chiquita Brown testified that she was able to take her meal breaks the entire time she worked at Atlas, with the exception of one month during the Pandemic. She was unable to take a meal break about three times a week during this one month or a total of twelve times. (Brown Dep. 29-31) (Doc. 42-1). Tameka Sibert testified that she was able to take her meal breaks until the Pandemic. In the ten-month period of March

---

[6] For clarity's sake, this Response uses the term "Opt-in Plaintiffs" to reference those individuals who have already submitted a Consent to Join Lawsuit Form to this Court. The term "Putative Plaintiff" is used to describe those individuals who have not submitted a Consent to Join Lawsuit Form but who are in the class Plaintiff seeks to certify: all hourly workers at Legacy of Savannah Quarters.

2020 through January 2021, she was unable to take a meal break three times a week. (Sibert Dep. 80-82) (Doc. 42-7). Brittney Mitchell estimates that she was unable to take a meal break one or two times a week before COVID and three times a week during COVID. (Mitchell Dep. 33) (Doc. 42-5). Marsha Grant testified that she missed meal breaks but has no way to estimate how many times it happened. (Grant Dep. 36-37) (Doc. 42-3). Kiara Hartwell testified in her declaration that most weeks she worked through her meal period three or four times. (Ex. 34 to Pl. Dep. ¶ 5) (Doc. 42-10). Tawanya Richards missed 13 meal breaks over 6 months.  (Richards Dep. 39) (Doc. 42-6).

Putative Plaintiff Johnson, a Cook, has missed meal breaks occasionally when the kitchen was busy. (Johnson Decl. ¶5) (Doc. 42-12). Lindsay Joyner, a Putative Plaintiff in the Nursing Department, has missed her meal break a "few times." (Joyner Decl. ¶8) (Doc. 42-17).

> 3.    <u>The reasons for being unable to take meal breaks</u>.

Green testified that it was harder to take breaks on the evening and night shift than on the day shift, because she was sometimes the only Med Tech on duty. (Green Dep. 61) (Doc. 42-2).  In that case, there was no one to relieve her on her med cart, which kept her from being able to take a break. *Id.* at 62-64.

Opt-in Sibert testified that she was not able to take breaks because of staffing (less than two Med Techs) and being called off her breaks to address emergencies.  (Sibert Dep. 94) (Doc. 42-7). Opt-in Plaintiff Brown testified that her inability to take breaks during one particular month was due to the Pandemic (which put a strain on staffing).  (Brown Dep. 29-30) (Doc. 42-1). Opt-in Plaintiff Mitchell testified that she was often just too busy to

take her breaks. (Mitchell Dep. 34) (Doc. 42-5). Opt-in Plaintiff Grant testified that she found it harder to take meal breaks when she worked in Memory Care. (Grant Dep. 40-43) (Doc. 42-3).

Putative Plaintiff Cassandra Johnson, a cook who works in the kitchen, testified that, although she could have taken a meal break, she sometimes chose to work through her break so the kitchen would not be behind. On these few occasions, she did not tell her supervisor, because she did not expect to be paid. (Johnson Decl. ¶6) (Doc. 42-12). Putative Plaintiff Joyner, a Med Tech, testified that nursing staff on the day shift may not get to take their breaks because it is busier during the day when residents are awake. (Joyner Decl. ¶5) (Doc. 42-17).

4.    Whether and how they reported missed meal breaks.

Green never used the missed time punch or exception form to report a missed meal break. She says that is not what this form was for; it was only for reporting an inability to clock in or out. (Green Dep. 31-34) (Doc. 42-2). She apparently never signed an Acknowledgment of Automatic Deduction form. She attended the September 20, 2020 in service meeting on "breaks" but remembers nothing about it. *Id.* at 71-72. Of all of the times she missed a meal break, Green only told a supervisor once or twice. *Id.* at 78-79.

Opt-in Plaintiff Brown reported every meal break she missed and got paid for all of them. (Brown Dep. 32-34) (Doc. 42-1). She filled out exception forms and told her supervisor when she missed breaks. Document 0209 within Exhibit 17 to the Plaintiffs' Depositions is an exception form Brown completed. It shows she worked 11:00 pm to 7:00 am and was to be paid for 8 hours. (Ex. 17 to Pl. Dep.) (Doc. 42-9). Brown testified that

she filled out this form because she missed her meal break and so she would be paid for 8 hours. (Brown Dep. 29) (Doc. 42-1). If the automatic deduction had not been overridden, she would only have been paid for 7.5 hours.

Tameka Sibert, an Opt-in Plaintiff and Green's sister, also understood what to do when she missed a meal break. (Sibert Dep. 60) (Doc. 42-7). She filled out an exception form multiple times for missed meal breaks. *Id.* Exhibit 19 to the Plaintiffs' Depositions contains several forms Sibert filled out to be paid for missed meal breaks (1672, 1662, and 1663). (Sibert Dep. 39, 40, 51-60) (Doc. 42-7). Sibert could not say under oath whether she was paid for these missed meal breaks. *Id.* at 40, 54, 58. Michelle Morgan, to whom two of the exception forms were submitted, testified that she made an adjustment to Sibert's time records on both occasions so Sibert would be paid. (Morgan Decl. ¶¶9-10) (Doc. 42-15). Sometimes, there was not a form available. (Sibert Dep. 42, 44) (Doc. 42-7). Sibert testified that, on the occasions when she could not find an exception form, there is no reason she could not have made a note that she missed her meal break on any piece of paper and given it to her supervisor. *Id.* at 62. When she did not use a form to report a missed meal break, she told a supervisor verbally. *Id.* at 42-44. On occasion, Sibert's supervisor Melissa Rost asked Sibert to review her time records because Rost was about to turn in Sibert's time to payroll and wanted to be sure it was correct. *Id.* at 66-67.

Opt-in Plaintiff Mitchell did not know what to do when she missed a meal break. No one explained it to her. (Mitchell Dep. 17) (Doc. 42-5). Although she signed an automatic deduction acknowledgment form, she only read half of it and therefore did not understand that she was to fill out an exception form if she missed a break. *Id.* at 17-19.

When asked if she ever told a manager or supervisor that she was unable to take a break, she answered:

> I think I've made complaints, like, I mean, just casually, like, oh, you know, I have so much to do. I don't think it was ever I said, I need a – I haven't had a meal break, you know.  Maybe indirectly.  I don't know if that makes sense or not.

*Id*. at 36. She never went to a manager or supervisor and said, "today I was not able to take a meal break." *Id.* at 36-37. Or yesterday I was unable to take a meal break. She never got that specific. *Id.* at 37.

Opt-in Plaintiff Grant never filled out a form when she missed a break.  (Grant Dep. 31) (Doc. 42-3). Grant reviewed her time records. When she noticed a problem, she would tell Chandra Willis or Penny Jernigan. Willis and Jernigan referred her to Dampier. Grant then reported the problems to Dampier who fixed them. *Id.* at 24-26. Although Opt-in Plaintiff Kiara Hartwell never signed an auto deduction acknowledgment form, she was verbally told that 30 minutes would be deducted each shift and that she should fill out a form if she was unable to take her break. (Hartwell Dep. 18-21) (Doc. 42-4). However, she was never able to find an exception form when she needed one. *Id.* at 20-21. So, anytime Harwell missed a meal break, she notified whoever was on call that night. That supervisor said, "Ok.  I'll go ahead and document that."  *Id.* at 21-22. The supervisors she told were Cathy Taylor or Josie Kirchner. They said they would fix it. Sometimes they did. According to Hartwell, Taylor and Kirchner did not always do what they said they would do. *Id*. at 26. Hartwell says there were four times she reported a missed meal break and still did not get paid for it. *Id*. at 26-29.

Tawanya Richards, another Opt-in Plaintiff, does not recall using an exception form to report a missed meal break. (Richards Dep. 28-29) (Doc. 42-6). When she reviewed her time records and paystubs, she sometimes noticed an inaccuracy caused by a missed meal break. She told her supervisor Josie Kirchner 7-8 times that she missed her meal break. *Id.* at 29. Kirchner sometimes fixed the problems, but Richards does not think she was paid for any missed meal breaks. *Id.* at 25-26, 32.

Cassandra Johnson is a Putative Plaintiff in the Kitchen Department. When she told her supervisor Greg Waterman she did not get a meal break, Waterman did what needed to be done for Johnson to be paid. (Johnson Decl. ¶5) (Doc. 42-12). But, sometimes, Johnson elected not to report a missed meal because she felt like it had been her decision not to take a break and she did not expect to be paid in those instances. *Id.* at ¶6. Putative Plaintiff Joyner told Dampier when she missed a meal break, and Dampier adjusted her time so she would be paid. (Joyner Decl. ¶¶8-9) (Doc. 42-17).

     5.    <u>Whether they were paid for all of their reported, missed meal breaks</u>.

Green only told a supervisor she missed a meal break "once or twice." (Green Dep. 78-79) (Doc. 42-2). Sometimes when she told a supervisor, it got fixed. But not always. *Id.*

Every time Opt-in Plaintiff Brown told her supervisor she missed a meal break, she got paid. (Brown Dep. 32-34) (Doc. 42-1). Opt-in Plaintiff Richards does not think she was paid for any of the missed meal breaks she told her supervisor Josie Kirchner about. (Richards Dep. 32) (Doc. 42-6). Sibert, another Opt-in, does not know one way or the other whether she was paid on the occasions she submitted an exception form. (Sibert Dep. 40)

(Doc. 42-7). Mitchell never reported any of her many missed meal breaks, verbally or in writing. (Mitchell Dep. 36-37) (Doc. 42-5). When Grant noticed an inaccuracy in her time records, she went to Chandra Willis or Penny Jernigan who referred her to Mary Dampier. When Grant went to see Dampier, she fixed the problems. (Grant Dep. 24-26) (Doc. 42-3). Every time Kiara Hartwell missed a meal break, she called a supervisor. She was paid for all of her missed meal breaks, except four times. (Hartwell Dep. 29) (Doc. 42-4).

On the five or six occasions Putative Plaintiff Johnson told the Kitchen Manager Greg Waterman she could not take her meal break, Waterman adjusted her pay. (Johnson Decl. ¶5) (Doc. 42-12). On the few occasions Lindsay Joyner, a Med Tech, missed her meal period, she told Dampier. Dampier adjusted Joyner's time, so she got paid. (Joyner Decl. ¶¶ 8-9) (Doc. 42-17).

6.    <u>Their job duties, shifts, departments, and supervisors.</u>

Green was a Med Tech on the 3-11 and 11-7 shifts. She worked double shifts 99% of the time. Her supervisors were Josie Kirchner, Michelle Morgan, Cathy Taylor, Chandra Willis, and Melissa Rost. (Ex. 11 to Pl. Dep., No. 16) (Doc. 42-9). On the evening and night shifts when Green worked, there was usually no supervisor present. When Green reported her missed meal breaks to Michelle Morgan, Morgan did not always follow through with adjusting Green's pay. (Green Dep. 84-85) (Doc. 42-2). Green believes it is harder to take meal breaks on the evening and night shifts because there was less staff available to relieve her. However, she did find time to do schoolwork while on the clock one or twice a week. *Id.* at 67.

Brown worked as a Med Tech on 3-11 and 11-7. Her supervisors were Josie Kirchner and Melissa Rost. (Brown Dep. 16-17) (Doc. 42-1). Rost consistently adjusted Brown's time when Brown reported a missed meal break. *Id*. at 33-34. Sibert worked primarily 7-3 – the day shift when there were always supervisors present. (Sibert Dep. 18-19) (Doc. 42-7). Her supervisors were Michelle Morgan, Chandra Willis, Melissa Rost, and Cathy Taylor. *Id*. at 19-20. Mitchell worked as a Med Tech on 3-11 and 11-7, when supervisors were usually not present. Her supervisors were Josie Kirchner and Penny Jernigan.  (Ex. 26 to Pl. Dep. No. 16) (Doc. 42-10). Grant worked mostly on days, 7-3, as a Med Tech. Her supervisors were Chandra Willis, Michelle Morgan, Yanti Wyant, Josie Kirchner, Cathy Taylor, and Melissa Rost. (Ex. 28 to Pl. Dep. No. 16) (Doc. 42-10). Grant believes it was harder to take breaks while working in the Memory Care building.  (Grant Dep. 40-43) (Doc 42-3).

Hartwell was a PRN Med Tech on 11-7, when there was only a supervisor on call. She worked on average two days a week and never more than four days a week. She occasionally worked more than 40 hours a week. (Hartwell Dep. 14-15) (Doc. 42-4). Her supervisors were Cathy Taylor, Michelle Morgan, and Melissa Rost.  (Ex. 32 to Pl. Dep. No. 16) (Doc. 42-10). Hartwell testified that Rost was good about "getting to the bottom of things," but Taylor and Morgan would not necessarily do what they said they were going to do. (Hartwell Dep. 26) (Doc. 42-4). When she complained to Cathy Taylor, Taylor told her she worked the 11-7 shift and had all night to take breaks. *Id.* at 38. Richards was a CNA on 7-3 and part of the 3-11 shift. She never worked a full 3-11 shift.  She was never

a Med Tech. Her supervisors were Josie Kirchner and Michelle Morgan.  (Richards Dep. 19) (Doc. 42-6). Richards worked in Memory Care 98% of her time.  *Id.* at 19-21.

Putative Plaintiff Cassandra Johnson is a cook who works 6:00 am to 2:30 pm. Her supervisor is the Kitchen Manager Greg Waterman. (Johnson Decl. ¶2) (Doc. 42-12). Tamme Clark, a Putative Plaintiff, is a housekeeper. She works a unique schedule of 8:00 am to 4:30 pm four day a week. Her supervisor is the Building Maintenance Manager Mitch Spence. (Clark Decl. ¶2) (Doc. 42-18). Putative Plaintiff RaShada Taylor is a Med Tech who has worked 3-11 and 11-7. Her supervisors have been Josie Kirchner, Teresa Stymer, Michelle Morgan, Melissa Rost, Shanta Howard, and Chandra Willis. (Taylor Decl. ¶¶3-4) (Doc. 42-14). Putative Plaintiff Lindsay Joyner has been a Med Tech on the 3-11 shift. (Joyner Decl. ¶2). Her supervisors have been Melissa Rost and Shanta Hayword.  *Id*. at ¶¶ 3, 6. Putative Plaintiff Brittni Barrett has worked 3-11 as a Caregiver. Her supervisors have been Yanti Wyant, Josie Kirchner, and Teresa Stymer. (Barrett Decl. ¶¶3, 5) (Doc. 42-11).

## II.    ARGUMENT

### A.    Plaintiff's Motion for Conditional Certification and Issuance of  Notice Should Be Denied.

#### 1.    Because discovery has been conducted, this Court should  apply a more exacting level of scrutiny to Plaintiff's request for conditional certification.

Section 216(b) of the FLSA authorizes employees to bring wage claims against their employees on behalf of "themselves and other employees similarly situated." 29 U.S.C. § 216(b). In managing collective actions, a district court has the discretion to order distribution of notice of the action to "similarly situated" employees when doing so would

permit the "efficient resolution in one proceeding of common issues of law and fact arising from the same alleged [] activity." *Hoffman-La Roche, Inc. v. Sperling*, 493 U.S. 165, 170 (1989). To demonstrate that the distribution of such notice is warranted, a plaintiff must demonstrate **both** that (1) there are other employees similarly situated to plaintiff and (2) those employees desire to join the lawsuit. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1259 (11th Cir. 2008).

District courts have used a variety of methods to determine the suitability of FLSA claims for collective adjudication, as neither Section 216(b) nor Supreme Court precedent dictates a specific method for this analysis. One such method involves a two-stage assessment, and it is upon this method that Plaintiff relies. Under this method, at the first stage (which occurs early in the case), the district court applies a "fairly lenient standard" to determine whether putative collective members are similarly situated based only on the pleadings and any affidavits that have been submitted. *See, e.g., Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1217 (11th Cir. 2001). After distribution of notice and a period of discovery, a defendant may then file a motion for decertification. *Id*. at 1218. At this second stage, the district court applies a more rigorous standard, determining whether the plaintiff and collective members are *in fact* similarly situated. *Id*. While many courts in the Eleventh Circuit have applied this two-stage approach, the Eleventh Circuit has repeatedly stated, "[N]othing in our circuit precedent *requires* district courts to use this approach. Instead, 'we suggest[ed] an approach district courts can use to better manage [§216(b)] cases.' We described the two-tiered approach as an 'effective tool for district courts to use in managing

these often complex cases.'" *Mickles v. Country Club, Inc*., 887 F.3d 1270, 1276-77 (11th

Cir. 2018) (emphasis in original) (quoting *Hipp*, 252 F.3d at 1214, 1219).

Here, Plaintiff asks this Court to certify a collective action and send out notice based

solely on the Complaint allegations and three declarations that the declarants have since

testified include incorrect and false information. (Green Dep. 75-76; Hartwell Dep. 38-43)

(Docs. 42-2, 42-4). Further, Plaintiff testified that she has tried to recruit eleven additional

employees to join the lawsuit; however, not a single one of those employees has opted in,

even though it has been over four months since Plaintiff filed her motion for certification.

In other words, Plaintiff is asking this Court to engage in "court-endorsed solicitation of

claims (by letting benign notice-giving for case-management purposes warp into endorsing

the action's merits, or seeming to, thus stirring up unwarranted litigation)." *Swales v.

KLLM Trans. Servs., LLC*, 985 F.3d 430, 435 (5th Cir. 2021). It is this type of danger that

has prompted more and more courts to recently abandon this lenient approach in favor of

more intermediate standards. *See e.g., id.*; *Broome v. CRST Malone, Inc.*, 2022 WL 205675

(N.D. Ala. Jan. 21, 2022). For example, the United States Court of Appeals for the Fifth

Circuit recently emphasized the grave responsibility of district courts to use their litigation

management authority **early** in litigation to prevent collective actions from being used to

stir up unwarranted litigation.  In doing so, the court analyzed this two-stage approach and

reasoned:

> Two-stage certification of §216(b) collective actions may be common
> practice. But practice is not necessarily precedent. And nothing in the FLSA,
> nor in Supreme Court precedent interpreting it, requires or recommends (or
> even authorizes) any "certification" process. The law instead says that the
> district court's job is ensuring that notice goes out to those who are "similarly

situated," in a way that scrupulously avoids endorsing the merits of the case. A district court abuses its discretion, then, when the semantics of "certification" trump the substance of "similarly situated."

\*\*\*

Rather, addressing [merit questions] from the outset aids the district court in deciding whether notice is necessary. And it ensures that any notice sent is proper in scope—that is, sent only to potential plaintiffs. When a district court ignores that it can decide merits issues when considering the scope of a collective, it ignores the "similarly situated" analysis and is likely to send notice to employees who are not potential plaintiffs.

*Swales*, 985 F.3d at 440, 442.

This reasoning is particular applicable in those instances, like here, where the parties have conducted some discovery prior to certification. "[S]ome courts within the Eleventh Circuit have determined that '[t]he rationale for the 'fairly lenient standard' [at the notice stage] . . . disappears, however, once plaintiffs have had an opportunity to conduct discovery with respect to defendant's policies and procedures.'" *Ide v. Neighborhood Rest. Partners, LLC*, 32 F. Supp. 3d 1285, 1291 (N.D. Ga. 2014) (quoting *Davis v. Charoen Pokphand (USA), Inc*., 303 F. Supp. 2d 1272, 1276 (M.D. Ala. 2004)). When that initial discovery has occurred, courts have conducted "a more stringent analysis to determine whether, in fact, there is a similarly-situated class." *Crutcher v. Millennium Nursing and Rehab. Ctr., Inc.*, 2010 WL 11564891, at \*6 (N.D. Ala. Aug. 18, 2010). *See also Ide*, 32 F. Supp. 3d at 1292 (finding that because discovery had been conducted "Plaintiff cannot simply rely on the allegations in the [] complaint and her own affidavit . . . ."); *Davis*, 303 F. Supp. 2d at 1276 (finding "it appropriate to apply a more rigorous standard than that called for [in the traditional notice stage]" because discovery had been conducted). In light of these same considerations, the Fifth Circuit held, *"In our view, **a district court must***

**rigorously scrutinize the realm of "similarly situated" workers, and must do so from the outset of the case, not after a lenient, step-one "conditional certification."** *Swales*, 985 F.3d at 434 (emphasis added). In her motion for conditional certification, Plaintiff explicitly recognized the impact discovery can have on the certification standard. *See* Doc. 23-1 at p.7 ("**Because this motion is filed <u>before</u> discovery**, Plaintiff's seek conditional certification of this collective action at the notice stage.") (emphasis added).

Here, Plaintiff moved for conditional certification on November 5, 2021. (Doc. 23). Subsequently, the Court allowed approximately 90 days for preliminary discovery into the facts underlying any potential certification. (Doc. 30). The parties engaged in extensive written discovery, exchanging over 2,355 pages of documents, and Defendant took depositions of the named Plaintiff and the six Opt-in Plaintiffs. Although Plaintiff had the opportunity to do so, she has not yet deposed any witnesses. As a result of this significant discovery, this Court does not have to rely solely on incorrect Affidavits and one-sided Complaint allegations in making its certification decision. Instead, it now has substantial evidence before it and should apply a more exacting standard in assessing the appropriateness of distributing notice and certifying this matter as a collective action. *See Broome*, 2022 WL 205675, at *4.

## 2. Green cannot satisfy the "similarly situated" standard because liability cannot be established on a "class-wide" basis.

The basic factual circumstances of this case preclude collective determination. "A collective action is improper when actual liability cannot be established on a class-wide basis. As a general rule, a group of opt-in plaintiffs cannot be similarly situated for purposes

of a collective action when individual determinations regarding liability must be made." *Willoughby v. Youth Villages*, 113 F. Supp. 3d 1265, 1275 (N.D. Ga. 2015) (internal quotations omitted). *See also Rindfleish v. Gentiva Health Servs., Inc.*, 22 F. Supp. 3d 1295 (N.D. Ga. 2014) ("As they cannot establish class-wide liability, Plaintiffs are not 'similarly situated' and, therefore, this action should not proceed as a collective action.") This is exactly the case here.

Green's claim and request for conditional certification is based on her allegation that Atlas engaged in a common policy and practice of failing to properly pay overtime wages to Green and others based on Atlas's automatic meal-break deductions policy. But that fails for two reasons. First, Plaintiff offers no evidence that Atlas had a pattern of FLSA violations because the automatic-deduction system Atlas uses is perfectly permissible under that statute. Without showing any FLSA violations, they axiomatically cannot show a *pattern* of FLSA violations. Second, even if Plaintiff could show any FLSA violations, the facts adduced in discovery show that the circumstances of each potential Plaintiff are so factually different, Plaintiff cannot meet the "similarly situated" test.

Plaintiff's first problem is that she has not shown any FLSA violations, much less a pattern of them. In *White v. Baptist Mem'l Health Care Corp.*, the Sixth Circuit considered an automatic deductions policy almost identical to Atlas's policy and found it permissible under the law. 699 F.3d 869, 873-74 (6th Cir. 2012). The court first noted that "[a]n automatic meal deduction system is lawful under the FLSA" and "the employee bears the burden to show that his or her mealtimes were compensable work." *Id*. (quotations omitted). Because automatic deductions policies are lawful, the key issue is whether the

employer knew or had reason to know that it was not compensating an employee for working during meal breaks. *Id*. at 875 ("[W]here an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of [the FLSA].") (quoting *Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir. 1981)).

Based on this knowledge component, the Sixth Circuit reasoned, "[u]nder the FLSA, if an employer establishes a reasonable process for an employee to report uncompensated work time[,] the employer is not liable for non-payment if the employee fails to follow the established process." *Id*. at 876 (citations omitted). This is because, "[w]hen the employee fails to follow reasonable time reporting procedures she prevents the employer from knowing its obligation to compensate the employee and thwarts the employer's ability to comply with the FLSA." *Id*. Importantly, as part of its analysis, the Sixth Circuit analyzed the employer's knowledge considering what the plaintiff told her employer about missing meal breaks:

> White occasionally told her supervisors that she was not getting her meal breaks. **But she never told her supervisors that she was not being compensated for missing her meal breaks.** Accordingly, there is no way Baptist should have known she was not being compensated for missing her meal breaks. Therefore, her claims fail.

*Id*. (emphasis added). As the court noted, "[t]he relevant knowledge is not 'I know that the employee was working,' but [instead] 'I know the employee was working and not reporting his time.'" *Id.* at 875 (quoting *Raczkowski v. TC Const. Co., Inc.*, 8 F.3d 29 (table), 1993 WL 385483, at *1 (9th Cir. 1993)). It was based on this reasoning and its finding that the

employer lacked actual or constructive knowledge of plaintiff's unpaid meal-break work that the Sixth Circuit affirmed summary judgment dismissing plaintiff's claims.

It is under this "knowledge" framework that Green's claim and request for conditional certification must be analyzed. Because automatically deducting meal breaks from compensation is perfectly lawful, Green has not submitted evidence of a common policy or practice that **violates** the FLSA or any other facts that would indicate that conditionally certifying a collective action would serve the interest of judicial economy. The Eleventh Circuit has not adopted a precise definition of "similarly situated," but it is clear from the caselaw that a plaintiff must do far more than make conclusory allegations of FLSA violations and assert that other employees worked the same job and therefore may have suffered the same violations. For purposes of considering the present motion, district courts in this Circuit have repeatedly and consistently made clear that in order to satisfy the "similarly situated" standard, plaintiffs much show that the plaintiffs and the putative class members were subjected to a common policy or practice that **violates** the FLSA. *See, e.g., Greenhill v. Wise Alloys, LLC*, 2013 WL 5350662, at *7-8 (N.D. Ala. Sept. 23, 2013) (denying motion for conditional certification where plaintiff failed to provide substantial allegations that putative class members were victims of a common policy or practice that resulted in FLSA violations); *Brooks v. BellSouth Telcomms, Inc.*, 2009 WL 10699685 at *7 (N.D. Ga. Feb. 10, 2009) ("Plaintiffs may satisfy their burden for conditional certification by showing a class-wide practice or policy that violates the FLSA. . . ."). Green has not done so here.

Second, Plaintiff cannot show that the factual circumstances of the alleged "failure to pay overtime" is sufficiently similarly. As explained above, whether an employer is liable for overtime compensation based on alleged missed meal breaks that were automatically deducted is a fact-intensive question. In other words, the fact that a plaintiff is denied a break and is not paid for it does not alone create FLSA liability. Instead, each plaintiff must also establish that (1) she actually worked more than 40 hours in any week in which overtime is claimed and (2) she reported the missed break to management using the reasonable measures adopted by the employer to report such missed breaks. Further, merely mentioning overtime, even repeatedly, to a supervisor has been found not to be enough. *See White*, 699 F.3d at 876. Such a showing obviously requires individualized factual inquiries.

For example, here, as explained in detail in Section I(B) above, Green, the Opt-in Plaintiffs, and the Putative Plaintiffs differ in (1) whether they missed meal breaks at all; (2) the frequency and time period of missed meal breaks; (3) the reasons for being unable to take meal breaks; (4) whether and how they reported missed meal breaks; (5) whether they were paid for their reported, missed meal breaks; and (6) their job duties, shifts, departments, and supervisors. This evidence alone shows that each individual will have different proof based on hire dates, supervisors, understanding of policies, signed acknowledgements, requests for deductions to be removed, and several other individualized factors. These differences between potential Plaintiffs go to the factual proof of liability and Atlas's defenses. In fact, one Opt-in Plaintiff admits that she was compensated correctly for all her missed meal breaks. (Brown Dep. 32-34). Another Opt-

in Plaintiff has no evidence that she ever reported missing a meal break to a supervisor. (Mitchell Dep. 36.) Grant, another Opt-in Plaintiff, has no evidence regarding how many times she was unable to take a meal break and was not paid for it, and she admits she does not have a way to estimate how many times it happened. (Grant Dep. 36-37). At least one Putative Plaintiff who has testified by declaration says that, while she has missed meal breaks, she has been fully compensated for them. (Joyner Decl. ¶¶8-9). These essential facts vary between the individual Plaintiffs; therefore, the issue of liability is not susceptible to common proof or imputing such proof to the remaining portion of the class. *See Rindfleisch,* 22 F. Supp. 3d at 1303 ("Put more simply, the Court cannot envision a more pertinent disparate factual setting, for purposes of the similarly situated inquiry, among a group of Plaintiffs than the fact that some members of the group do not actually have a viable claim in the action at issue.") Accordingly, Green's motion for conditional certification is due to be denied.

Other federal courts in Georgia have agreed that factual differences in alleged "failure to pay overtime" claims based on automatic-deductions policies will defeat certification. In *Willoughby v. Youth Villages, Inc.*, the plaintiffs brought collective action claims against their employer alleging FLSA violations based, in part, on the employer's alleged failure to pay overtime compensation due to the deduction of break time for breaks not taken. 113 F. Supp. 3d 1265, 1267 (N.D. Ga. 2015). The employer asserted it had a policy requiring employees to inform the payroll department if they worked through any automatically deducted breaks. *Id*. at 1269. If an employee reported working during a break, the payroll department cancelled the deduction and ensured the employee was

properly compensated. *Id*. The court considered these matters on the Defendant's motion to decertify the class after a period of discovery. In framing its analysis of the facts and claims related to the allegedly missed and unpaid meal breaks, the court stated, "What is relevant to the legal question before the court on decertification is the type of evidence that the parties will present on whether Defendant knew or had reason to believe that employees were working overtime hours without pay." *Id*. at 1274.

Because the court found "that evidence varie[d] from Plaintiff to Plaintiff," *id.*, it concluded: "[T]he factual circumstances of this case—which require the court to make such individualized inquiries—preclude collective determination," *id*. at 1273. Specifically, the court reasoned:

> To determine liability [], the fact-finder will need to look at each Plaintiff's testimony concerning whether he was able to take breaks or not during a particular time period. The fact-finder will also then need to look on a week-by-week basis to determine whether this Plaintiff took any accrued leave during those weeks in which he claims he was not able to take breaks and therefore his hours exceeded forty. The fact-finder must also then consider whether Plaintiff asked for and received corrections for any particular week he asserts he worked overtime hours, and whether this particular Plaintiff's supervisor knew or should have known Plaintiff was working overtime that week. This last inquiry hinges on evidence such as what instructions that particular supervisor gave the employee on whether he was permitted to take breaks, whether he was to "refuse" to take breaks, or how he might have been instructed to fill out a "break log" after their use was instituted.

> ****

> Moreover, the fact that many Plaintiffs asked for and received corrections on their pay related to the automatic deduction and some Plaintiffs testified that they were able to take breaks at least some of the time also creates individual defenses on liability.

*Id.* at 1274-75. Based on these numerous and varying factors, the court decertified the class finding "[t]hese differences among Plaintiffs make it impossible for the court to determine on a collective basis whether each Plaintiff ever worked a week in excess of 40 hours without receiving overtime . . . ." *Id.* at 1275. *See also Zulauf v. Amerisave Mortg. Corp.*, 911 F. Supp. 2d 1266, 1275 (N.D. Ga. 2012) ("The Court agrees that, absent evidence of a FLSA-violating company-wide policy (or policy-to-violate-the-policy), [Defendant's] knowledge of *each* [Plaintiff's] overtime is relevant, and such individualized defenses favor decertification.").

As set out in Section I(B) above, the same crucial differences exist here. As a result, to determine liability **and** Atlas's defenses, the fact-finder would at least have to look at each Plaintiff's testimony as to whether she missed breaks; she worked any overtime; she reported the missed time; the deduction was cancelled; and the supervisor knew or should have known she was working overtime in any particular week. In other words, here, like in *Willoughby*, "while the automatic deduction policy applied to all employees, it impacted employees in different ways depending on whether they had the opportunity to take breaks and whether they asked for corrections to be made for the automatic deductions." *Id.* at 1275-76. Accordingly, because liability cannot be established on a "class-wide basis," Green cannot satisfy the "similarly situated" standard and her motion to certify should be denied.

### 3.   Green has failed to establish that other similarly situated employees wish to join the lawsuit.

"Certification of a collective action and notice to a potential class is not appropriate to determine *whether* there are others who desire to join the lawsuit." *Vondriska v. Premier Mort. Funding, Inc.*, 564 F. Supp. 2d 1330, 1334 (M.D. Fla. 2007) (emphasis in original). Therefore, a district court may not distribute notice of a proposed collective action unless the plaintiff has demonstrated that other similarly situated employees wish to join the suit. *See Dybach v. State of Fla. Dep't of Corrections*, 942 F.2d 1562, 1567-68 (11th Cir. 1991); *Raskin v. Am. Bankers Life Assurance Co. of Fla.*, 2021 WL 2915084, at *2 (S.D. Fla. July 12, 2021) ("Courts applying the Eleventh Circuit's two-step §216(b) certification framework routinely find that failure to provide evidence of a significant number of individuals who will opt into a class is fatal to conditional certification, notwithstanding the generally lax standard."). To meet this burden, "Plaintiffs must provide declarations, affidavits, or consents-to-opt-in from the potential class members. Unsupported allegations or mere stated belief by Plaintiffs or their counsel that there are other similarly situated employees or former employees will not suffice." *Linscheid v. Natus Med. Inc.*, 2012 WL 12861603, at *3 (N.D. Ga. Nov. 15, 2012) (denying conditional certification because Plaintiffs' "own declarations and the declaration of the single opt-in plaintiff" is not "sufficient evidence that other [employees] would actually opt in if given the opportunity."). Further, "[c]ourts have held that conditional certification should be denied where plaintiffs offer no evidence that individuals, **other than those who have already**

**joined**, desire to join the action." *Crutcher*, 2010 WL 11564891, at *6 (collecting cases) (emphasis added).

Here, other than the six individuals who have already joined, Green has presented no evidence that any individuals (whether similarly situated or not) wish to join this lawsuit. This is despite the fact that Green and her sister admittedly have worked to recruit other employees to join. Although Green has made a list of seventeen Nursing Department employees she thinks would be interested in joining the case, not a single individual (other than the six who have already joined) on that list has opted in, and Green has presented no evidence – through declarations or otherwise – that any of those individuals wish to do so. This is despite the fact that her motion for conditional certification was filed more than four months ago, and her Complaint was filed almost eight months ago. As such, she cannot meet her burden, and her motion for conditional certification is due to be denied. *See Raskin*, 2021 WL 2915084, at *3 (denying conditional certification, in part, because "[m]erely indicating that up to 25 or 30 individuals may have suffered harms similar to Plaintiff is insufficient to show that individuals other than the five consenting individuals would join the action if given notice.").

     **4.    Even if the Court finds that Green is similarly situated to other med techs and that others wish to join the lawsuit, notice should be limited to hourly employees in the nursing department who have worked at Legacy since August 2019.**

Green has failed to meet her burden of establishing that she is similarly situated to the class she wishes to represent, and her attempt to certify a class of all hourly workers at Legacy at Savannah Quarters since August 20, 2018 fails.

{B4253497}                        32

> [A] plaintiff must make some rudimentary showing of commonality between the basis for his claims and that of the potential claims of the proposed class, beyond the mere facts of job duties and pay provisions, because without such a requirement, it is doubtful that §216(b) would further the interests of judicial economy, and it would undoubtedly present a ready opportunity for abuse.

*Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1234 (M.D. Ala. 2003) (internal citations omitted).

First, Atlas – the Defendant in this case – did not start operating the facility until August 31, 2019. It was not until **after** Atlas purchased the facility that the automatic deductions policy at issue was implemented. Accordingly, no employee working at Legacy prior to August 31, 2019 can be "similarly situated" for purposes of this collective action, in part, because (1) they did not work for Atlas; (2) they were not subject to the same general pay provisions; (3) they were not subject to the automatic deductions policy at issue; and (4) there is no evidence that any such employee was denied overtime compensation.

Second, even if the Court were to find that Green is similarly situated to other Med Techs, Green has failed to meet her burden of establishing that she is similarly situated to any employee that works outside of the Nursing Department. Mainly, no department other than the Nursing Department provides direct care to residents. The other departments (Housekeeping, Kitchen, Concierge, and Maintenance) run on different schedules and shifts; are not 24-hour operations; perform entirely different duties; have different break procedures; and report to different supervisors. Importantly, Green has presented no evidence that any employee working outside of the Nursing Department has been denied

proper overtime compensation; has missed a meal break; has had a meal break improperly deducted from his/her pay; or wishes to join this lawsuit. Instead, as explained in detail in Section I(B), the record evidence establishes the exact opposite. Because Green cannot even make some "rudimentary showing of commonality" between herself and employees working in other departments and prior to August 30, 2019, should this Court grant conditional certification, any collective action notice must be limited to only those hourly employees working in the Nursing Department since August 30, 2019.[7]

## III.    CONCLUSION

For all of the foregoing reasons, Green has failed to establish that (1) there are other employees similarly situated to her and (2) those employees desire to join this lawsuit. Accordingly, this Court should deny her Motion for Conditional Certification in full, as any other result would only stir up unwarranted litigation. Should the Court instead choose to certify this collective action, the distribution of a fair, balanced notice (unlike the one proposed by Green) should be limited to those hourly workers in the Atlas Nursing Department since August 31, 2019.

---

[7] Should this Court decide that conditional certification is proper, the Court should allow the parties the opportunity to develop a notice that is agreed on by the parties prior to distribution. Court-sanctioned notice should be accurate, balanced, and not misleading. *See e.g., Quinteros v. Sparkle Cleaning, Inc.*, 532 F. Supp. 2d 762, 772 n.6 (D. Md. 2008). Defendant objects to the notice proposed as Exhibit 4, as it overbroad, unbalanced, unfair, and improper as written. (Doc. 23-5). For example, it fails to even mention Defendant's position in response to these claims. For these reasons, in the event this Court grants Plaintiff's Motion for Conditional Certification, or any part thereof, the Court should reject the proposed notice as written.

Respectfully Submitted,

*s/ Arnold W. Umbach III*
Arnold W. Umbach III (ASB-1932-M66A)
STARNES DAVIS FLORIE LLP
100 Brookwood Place, Seventh Floor
Birmingham, Alabama 35209
(205) 868-6000 - Phone
(205) 868-6099 - Facsimile
tumbach@starneslaw.com

*s/Lucas D. Bradley*
Lucas D. Bradley
Georgia Bar No. 671236
BOUHAN FALLIGANT LLP
One West Park Avenue
Savannah, Georgia 31401
ldbradley@bouhan.com
(912) 644-5787 - Direct
(912) 232-7000 - Phone
(912) 233-0811 - Facsimile

*Attorneys for the Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on March ___, 2022, I electronically filed the foregoing with the Clerk of the Court using the CM-ECF system, which will send electronic notification of such filing to the following:

Andrew Y. Coffman
Parks, Chesin & Walbert P.C.
75 14th Street, N.E.
26th Floor
Atlanta, Georgia 30309
acoffman@pcwlawfirm.com

*s/ Arnold W. Umbach III*
Arnold W. Umbach III (ASB-1932-M66A)